UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| ROBB EVANS, et. al., | ) | |
| | ) | Civil No. 14-330-GFVT |
| Plaintiffs, | ) | |
| | ) | **MEMORANDUM OPINION** |
| v. | ) | **&** |
| | ) | **ORDER** |
| ANNA BURRELL, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

This action has been brought to recover monies allegedly received from the operation of "an unlawful multilevel marketing 'pyramid' scheme which collectively generated gross revenues of approximately $252 million from January 1, 2009 through December 31, 2012." [R. 12 at ¶ 27.] Plaintiff (hereinafter, "Receiver") has been appointed Receiver for Fortune Hi-Tech Marketing, Inc., FHTM, Inc., Alan Clark Holdings, LLC, FHTM Canada, Inc. and Fortune Network Marketing (UK) Limited, and their affiliates, subsidiaries, divisions, or sales or customer service operations (individually and collectively referred to as the "Receivership Entities").[1] [R. 12 at ¶¶ 1, 8.] That appointment took place in a related civil enforcement action that is also before this Court, *Federal Trade Commission, et al, v. Fortune Hi-Tech Marketing, Inc., et. al.,* Case No. 13-cv-123. Pursuant to Orders entered in that case, the Receiver herein, "is authorized to institute actions or proceedings in federal courts as the Receiver deems necessary or advisable to preserve or recover the assets of the Receivership Defendants or that the Receiver

---

[1] These entities are referred to by the parties as "Receivership Defendants." For purposes of clarity and in an effort to distinguish them from the Defendants in this action, the Court has elected to refer to them as "Receivership Entities."

deems necessary or advisable to carry out the Receiver's duties under the Receivership Orders, including instituting actions challenging fraudulent or otherwise voidable transfers." [R. 12 at ¶ 8.] Subsequently, the Receiver was granted express authority to "commence litigation, in the Receiver's discretion, against highly compensated representatives of the Receivership Defendants to recover commission and bonus payments made by the Receivership Defendants." [R. 12-4; R. 34 at 8.] Pursuant to this authority, the Receiver now sues Defendants for the recovery of monies received from Fortune Hi-Tech Marketing and its related entities.[2]

## I

In its amended complaint, the Receiver explains in great detail how the pyramid scheme worked. Broadly speaking, the:

> Receivership Defendants' business ostensibly offered interested persons the opportunity to become "Independent Representatives" ("IRs") who paid fees to the Receivership Defendants to enroll in the sales force in order to be able to sell products, including health and beauty products, and services provided by third party companies and earn income through those sales and through bonuses paid for recruiting new IRs into the Receivership Defendants' network.

[R. 12 at ¶ 28.] In compensation for recruiting new members, representatives would receive Customer Acquisition Bonuses (CAB) and in compensation for the sale of products and services, representatives received Customer Generated Usage (CGU) commission payments. [*Id.* at ¶ 30.] According to the Receiver, the business was structured so as to incentivize the "recruitment of new representatives rather than the actual selling of products and services." [*Id.* at ¶ 31.] What resulted was a two-tiered system where "the vast majority of active IRs did not obtain payments

---

[2] The Receivers have also instituted suit in *Robb Evans and Robb Evans & Associates LLC as Receiver etc., et al., v. Ramiro Armenta, et al.*, Case No. 14-cv-00329 GFVT ("Armenta Action."). As noted by the Receiver, a substantially identical motion to dismiss is pending in that case. Due to the parallel nature of the proceedings and the identical pending motions, the Court will enter a substantially identical Order in that case.

sufficient to cover their enrollment fees and earned commissions totaling $1,000 or less." [*Id*. at ¶ 35.] During one four-year time period, "more than 88% of the IRs active during that time period did not obtain payments sufficient to recover their enrollment fees, and 98% of the active IRs during that time frame earned commissions totaling $1,000 or less." [*Id*.] These IRs receiving less than $1,000 during their association have suffered losses in excess of $169 million and are referred to as "injured consumers" herein. [*Id*. at ¶ 42.] In contrast to the injured consumers' meager returns, a small number of IRs fared much better, with "approximately 50 of the highest paid representatives generated commissions and bonuses totaling more than $46 million." [*Id*. at ¶ 37.] These IRs are referred to as "Highly Compensated IRs," and it is the Receiver's contention that they "fueled the Pyramid Scheme operated by the Receivership Defendants for their personal gain…" [R. 12 at ¶ 40.] According to the Receiver, the "business was inherently unsustainable" as "profits were insufficient to fund the payments which were offered to all IRs." [*Id*. at ¶ 38.]

In this action, the Receiver charges the Defendants with acting as Highly Compensated IRs who:

> helped perpetuate and implement the Pyramid Scheme by continuing to recruit new IRs who would pay enrollment fees to the Receivership Defendants and encouraging IRs to continue to renew their association with the Receivership Defendants and pay their renewal fees to the Receivership Defendants in order to continue the operation of the Pyramid Scheme and for the Highly Compensated IRs' personal gain with knowledge or reckless disregard of the fact that the vast majority of the IRs would not recover the monies they paid to participate in the Receivership Defendants' program and would lose money and be damaged as a result of their association with the Receivership Defendants.

[R. 12 at ¶ 46.]  The Receiver sues for the recovery of monies transferred from the Receivership Entities to Defendants herein.  The specific sum sought from each of the Defendants is specifically laid out in paragraph 48 of the Amended Complaint.  [*Id.* at ¶ 48.]

Defendants challenge whether the Receiver sufficiently pled its claims in its First Amended Complaint, whether the Receiver has standing to prosecute this action, and whether the Receiver should be prohibited from pursuing its claims under the *in pari delicto* or *unclean hands* doctrine.  [R. 26.]  The motion has been fully briefed, [R. 34; R. 35] and is now ripe for the Court's consideration.  For the reasons stated herein, the Defendants' motion is **DENIED**.

## II

### A

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to seek dismissal of a complaint which fails to state a claim upon with relief can be granted.  Fed.R.Civ.P. 12(b)(6).  "The purpose of a Rule 12(b)(6) motion is to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true."  *Campbell v. Nationstar Mortgage*, 611 F. App'x 288, 291 (6th Cir. 2015) (internal quotations omitted).  In reviewing a Rule 12(b)(6) motion, the Court "accept[s] all the Plaintiffs' factual allegations as true and construe[s] the complaint in the light most favorable to the Plaintiffs." *Hill v. Blue Cross & Blue Shield of Mich.,* 409 F.3d 710, 716 (6th Cir. 2005).  To properly state a claim, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).

As is now well known, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

4

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544,

570 (2007)).  In amassing sufficient factual matter, plaintiffs need not provide "detailed factual

allegations," but must advance "more than an unadorned, the-defendant-unlawfully-harmed-me

accusation," or "a formulaic recitation of the elements of a cause of action."  *Id*. (citing *Twombly*,

550 U.S. at 555).  Though courts must accept all factual assertions as true, they "are not bound to

accept as true a legal conclusion couched as a factual allegation."  *Id*. (citing *Twombly*, 550 U.S.

at 556).  Thus, it is incumbent upon the Court to first sort through the plaintiff's complaint and

separate the factual allegations, which are accepted as true and contribute to the viability of the

plaintiff's claim, from the legal conclusions that are only masquerading as facts and need not be

accepted.

Once the Court has discarded the legal conclusions, the question becomes whether the

actual remaining facts state a plausible claim for relief.  Plaintiffs do not succeed in making a

claim plausible by adorning their complaints with facts creating a "sheer possibility that a

defendant has acted unlawfully" or facts that are "merely consistent with a defendant's liability."

*Id*. (citing *Twombly*, 550 U.S. at 557).  Instead, "[a] claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556).

**B**

**1**

Defendants argue that the Receiver has failed to adequately plead its claims in light of the

pleading standards articulated in *Iqbal*, 556 U.S. 662, and *Twombly,* 550 U.S. 544.  They argue

that the claims are largely "limited to legal conclusions" and also complain that the claims are

5

based only on the Receiver's "information and belief." [R. 26-1 at 5.]

First, the suggestion that the complaint rests solely on legal conclusions is unfounded.  As was articulated, *supra I,* the Receiver lays out the factual predicate supporting their claims in great detail.  In arguing that the complaint only contains legal conclusions, the Defendants glance over nearly thirty paragraphs of factual content contained within the Receiver's complaint.  [*See* R. 12 at ¶¶ 27-53.]  Defendants also fail to recognize the Receiver incorporated by reference both the preliminary and permanent injunctions entered in the FTC action.[3]  [R. 12 at ¶ 6-7; R. 12-2; R. 12-3.]  The amended complaint explains the marketing scheme, how the IRs were compensated, and the financial harm that the scheme caused to injured consumers.  It also contains specific allegations about the total sum of payments and transfers of funds attributable to each Defendant.  [*See* R. 12 at ¶ 48.]  Defendants complain specifically that the Receiver provides few details about the specifics surrounding the transfers between the Receivership Entities and the Defendants herein, and also asserts that additional information needed to be pled to support the Receiver's claim that the transfers were made without valuable consideration.  [R. 26-1 at 5.]  The Receiver did not, however, need to include these details in its complaint.  *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555) (Plaintiffs need not provide "detailed factual allegations," but must advance "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," or "a formulaic recitation of the elements of a cause of action.")  The

---

[3] It is permissible to incorporate documents by reference into a complaint.  *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 467 (6th Cir. 2014); Fed. R. Civ. P. 10 ("A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion."); *Wuliger v. Manufacturers Life Ins. Co.*, 567 F.3d 787, 795-96 (6th Cir. 2009) ("Although the Receiver did not expressly state that his claim was one that could have been brought by a receivership entity, the Receiver did incorporate by reference the court's prior orders establishing the receivership.")

Receiver has put forth "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (citing *Twombly*, 550 U.S. at 570).

Second, Defendants suggest that any complaint which utilizes the words "information and belief" is inherently insufficient. [R. 26-1 at 5-6.] In support of this proposition they cite to *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502 (6th Cir. 2013) and *In re Darvocet, Darvon, & Propoxyphene Products Liab. Litig.*, 756 F.3d 917, 931 (6th Cir. 2014), two cases where the Sixth Circuit has looked unfavorably upon such pleading. In *Flagstar Bank*, the Plaintiff, who was of Iraqi origin, sued a lender alleging that he had been discriminated against on the basis of his national origin when the lender refused to refinance his loan. After noting that the allegations were rendered on "information and belief," the Court said the following:

> These are precisely the kinds of conclusory allegations that *Iqbal* and *Twombly* condemned and thus told us to ignore when evaluating a complaint's sufficiency. No doubt disparate treatment of similarly situated people may support an inference of discrimination. *See, e.g., Keys v. Humana, Inc.,* 684 F.3d 605, 610 (6th Cir.2012). But the plaintiffs have not identified any similarly situated individuals whom Flagstar treated better. They have merely alleged their "belief" that such people exist. These "naked assertions devoid of further factual enhancement" contribute nothing to the sufficiency of the complaint. *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (internal quotation marks and alteration omitted).

*Flagstar Bank,* 727 F.3d at 506. In affirming the district court's dismissal, the Sixth Circuit found that the Plaintiff's claims were "merely consistent with liability," but not plausible—making dismissal appropriate. *Id*. at 505.

In *Darvocet*, the Sixth Circuit dismissed a "Failure-to-Update" claim at least in part because it was pled upon "information and belief." *Id*. at 931-392. In so doing, the Court depended in part on its earlier holding in *Flagstar*:

7

> To survive a motion to dismiss, a complaint must plead "facts" that create a "plausible inference" of wrongdoing. *Iqbal,* 556 U.S. at 682, 129 S.Ct. 1937. The mere fact that someone believes something to be true does not create a plausible inference that it is true. *See, e.g., Twombly,* 550 U.S. at 551, 127 S.Ct. 1955 (finding a complaint insufficient even though it said, "Plaintiffs allege upon information and belief that [defendants] have entered into a contract, combination or conspiracy to prevent competitive entry...."); *16630 Southfield Ltd. P'ship v. Flagstar Bank,* 727 F.3d 502, 506 (6th Cir.2013) (finding a series of "upon information and belief" claims insufficient, because the plaintiffs "have merely alleged their 'belief' ")

*Darvocet*, 756 F.3d at 931.  The Court went on to further consider whether any exceptions to this principle saved the claim pled on information and belief, and ultimately concluded that "[e]ven putting aside the words 'upon information and belief,' [that] the complaint still fail[ed]." *Id.*

The Receiver argues, first, that its use of the words "information and belief" are not fatal to its complaint.  The Court agrees.  While pleading on information and belief cannot necessarily insulate a plaintiff at the 12(b)(6) stage, *Iqbal* did not render pleading on information and belief entirely ineffectual. *E.g., Arista Records, LLC v. Doe,* 604 F.3d 110, 120 (2d Cir.2010) ("The *Twombly* plausibility standard, which applies to all civil actions, does not prevent a plaintiff from "pleading facts alleged 'upon information and belief'" where the facts are peculiarly within the possession and control of the defendant, *see, e.g., Boykin v. KeyCorp,* 521 F.3d 202, 215 (2d Cir. 2008), or where the belief is based on factual information that makes the inference of culpability plausible, *see Iqbal,* 129 S.Ct. at 1949 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.")).  The Court will address whether facts are within the Defendants' possession *infra,* but the point is really rendered moot by the fact that the Receiver set forth sufficient factual information in support of its allegations to allow the Court to reasonably infer that the Defendants are liable to the Receivership Entities.

To the extent the Court finds its allegations made on "information and belief" are insufficient, the Receiver alternatively argues its complaint still survives because of two exceptions to the general preference against pleading on information and belief.  First, Bankruptcy trustees are permitted to plead facts on information and belief because they normally only have secondhand knowledge of the facts they plead.  [R. 34 at 16.]  The Receiver argues that it should receive the same treatment, but cites no case law to support this argument. Defendants point out that "[a] bankruptcy receiver's duties and functions are different from those of an equity receiver, particularly because the scope of a bankruptcy receiver's power is set forth in statutes."  *Liberte Capital Grp., LLC v. Capwill*, 248 F. App'x 650, 667 (6th Cir. 2007) (citations omitted).  Second, the Receiver argues that its information and belief pleadings should be accepted because the facts alleged are in the Defendants' possession.  [R. 34 at 16.]  While the facts are doubtless in Defendants' possession, the Receiver does little to explain why those facts are "peculiarly" in their possession.  *See Arista Records, LLC v. Doe,* 604 F.3d 110, 120 (2d Cir.2010) ("The *Twombly* plausibility standard, which applies to all civil actions, does not prevent a plaintiff from "pleading facts alleged 'upon information and belief'" where the facts are *peculiarly within the possession and control of the defendant*."); *In re Darvocet,* 756 F.3d at 931 (The Generic Manufacturers are not "peculiarly" in possession of the facts about whether a box of propoxyphene contains a package insert bearing the updated Black–Box warnings.) Accordingly, neither exception applies.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  While it is understandable that

complaints pled on information and belief often will not meet this threshold, that is not always the case. Here, the Receiver's allegations are certainly not the "formulaic recitation of the elements of a cause of action" that were found to be inadequate in *Iqbal*, 556 U.S. at 678. As noted *supra*, the Receiver pleads nearly thirty paragraphs of factual content. [*See* R. 12 at ¶¶ 27-53.] While most of that content explains how the pyramid scheme operated as opposed to the particularities surrounding the transfers to the Defendants herein, the Defendants cannot argue that they are without notice of the charges against them. As noted by the Supreme Court in *Iqbal*, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." 556 U.S. at 679. In this case, it is understandable that the Receiver does not have first-hand knowledge of all the facts asserted in his complaint. Notwithstanding, the Receiver has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556).

**2**

Next, Defendants challenge whether the Receiver has standing to prosecute these claims. A receiver, like any party seeking relief, is "inherently limited by the jurisdictional constraints of Article III and all other curbs on federal court jurisdiction.'" *Liberte Capital Grp., LLC v. Capwill*, 248 F. App'x 650, 655 (6th Cir. 2007) (quoting *Scholes v. Schroeder,* 744 F.Supp. 1419, 1421 (N.D.Ill.1990)).

> To satisfy the "case" or "controversy requirement" of Article III, which is the "irreducible constitutional minimum" of standing, a plaintiff must, generally speaking, demonstrate that he has suffered "injury in fact," that the injury is "fairly traceable" to the actions of the defendant, and that the injury will likely be redressed by a favorable decision.

*Id.* (quoting *Bennett v. Spear,* 520 U.S. 154, 162 (1997) (citation omitted)). "The general rule is that a receiver acquires no greater rights in property than the debtor had," or put another way, a receiver "stand[s] in the shoes of the entity in receivership." *Wuliger v. Manufacturers Life Ins. Co.,* 567 F.3d 787, 793 (6th Cir. 2009) (quoting *Javitch v. First Union Sec., Inc.*, 315 F.3d at 625 (6th Cir. 2003)). Accordingly, a receiver "lack[s] standing to bring suit unless the receivership entity could have brought the same action." *Id.* (quoting *Javitch*, 315 F.3d at 625 (citations omitted). Even though "the stated objective of a receivership may be to preserve the estate for the benefit of creditors, that does not equate to a grant of authority to pursue claims belonging to the creditors." *Javitch*, 315 F.3d at 627 (citing *Jarrett v. Kassel,* 972 F.2d 1415, 1426 (6th Cir.1992)).

Defendants now argue that the Receiver lacks standing because the claims asserted actually belong to the creditors of the Receivership companies, as opposed to the Receivership companies themselves. [R. 26-1 at 8.] The Receiver disagrees, arguing that the complaint alleges injury against the Receivership Entities, and that the fact that creditors will benefit from the Receivership Entities' recovery is really incidental. [R. 34 at 12.]

**a**

Because the Receiver "stand[s] in the shoes of the entity in receivership" and is permitted to assert any claim that the receivership entity could independently assert, *Wuliger,* 567 F.3d at 793 (quoting *Javitch,* 315 F.3d at 625), the question presented is whether the Receivership Entities could themselves assert a claim under Kentucky's fraudulent conveyance statutes. The starting point for this analysis are the state statutes in question. KRS 378.010 provides that:

> Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real
> or personal, or right or thing in action, or any rent or profit thereof, made with the

> intent to delay, hinder or defraud *creditors, purchasers or other persons*, and every bond or other evidence of debt given, action commenced or judgment suffered, with like intent, shall be void as against such *creditors, purchasers and other persons*. This section shall not affect the title of a purchaser for a valuable consideration, unless it appears that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.

Ky. Rev. Stat. Ann. § 378.010 (emphasis added).  The second statute upon which the Receiver depends is KRS 378.020, which provides that "[e]very gift, conveyance, assignment, transfer or charge made by a debtor, of or upon any of his estate without valuable consideration therefor, shall be void as to all his then *existing creditors*…"  Ky. Rev. Stat. Ann. § 378.020.  According to Defendants, these statutes provide a cause of action for creditors, not for a receiver standing in the shoes of the Receivership Entities.  [R. 26-1 at 9-10.]  The Court has not been made aware of any Kentucky case that addresses this question.

In support of its argument that the Receiver does not fall within the statutes' class of potential claimants, the Defendants direct the Court to *Eberhard v. Marcu*, 530 F.3d 122 (2d Cir. 2008), a Second Circuit case that interpreted New York's fraudulent conveyance statute.  The New York statute provided that "[e]very conveyance made and every obligation incurred with actual intent. . . to hinder, delay, or defraud either present or future creditors, is fraudulent *as to both present and future creditors*."  *Id*. at 129. (quoting N.Y. Debt. & Cred. Law § 276 (emphasis added)).  Considering both the statute's plain language and its legislative history, the Second Circuit concluded that only creditors were permitted to set aside fraudulent conveyances. *Id.* at 130-31.  After the Court decided that the statute only extended to creditors, they proceeded to consider whether the receiver represented a creditor or the wrongdoer himself.  For a number of reasons, the Second Circuit's conclusion in *Eberhard* is inapposite here.  First, Kentucky's fraudulent conveyance statute is broader than the statute presented in *Eberhard*.  The New York

statute limits actions solely to creditors, whereas KRS § 378.010 refers to "creditors, purchasers or *other persons*." KRS § 378.010.  As recognized by the *Eberhard* Court, "some federal receivers have enjoyed the benefit of state statutes imposing looser standing requirements [than that of New York].  *Eberhard*, 530 F.3d at 134-35 (citing *e.g., Stenger v. World Harvest Church, Inc.,* 2006 WL 870310, at \*4 n. 6 (N.D.Ga. Mar. 31, 2006) (allowing receiver to pursue fraudulent conveyance claim under former Ga.Code. Ann. § 18–2–22 which provided that fraudulent conveyances were "null and void" as to "creditors *and others.*" (emphasis added)). This is just such a case.  Second, *Eberhard* is also distinct as the receiver in that case was appointed to stand solely in the shoes of an individual wrongdoer, not a corporate receivership entity.  The *Eberhard* Court discussed this distinction in great detail, and suggested that its outcome could have been different if the receiver stepped into the shoes of both *Eberhard* and related corporate entities.  *Id.* at \*132-133.  The Court's holding was, in essence, that an investment entity or corporation represented by a receiver *is* a creditor for purposes of recovering under a fraudulent conveyance statute.  Ironically, in coming to this conclusion, the Second Circuit relied on, and applied *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995) — a case which the Defendants take great issue with.  This conclusion is consistent with that of other courts who have held that "a receiver in a Ponzi case *is* defined as a creditor for the purposes of establishing standing," rendering the reference to "other persons" irrelevant.  *Wing v. Hammons*, 2009 WL 1362389, at \*3 (D. Utah May 14, 2009) (citing *Scholes,* 56 F.3d at 753–55).

As articulated by the Receiver, courts across the nation have held that "receivers of corporate entities have standing to sue to recover funds or assets fraudulently transferred by those entities prior to the receivership."  [R. 34 at 20.]  *See Scholes v. Lehmann*, 56 F.3d 750 (7th

Cir. 1995), *cert. denied sub nom. African Entr. Inc. v. Scholes,* 516 U.S. 1028 (1995)[4]; *Donell v. KowelI*, 533 F. 3d 762 (9th Cir. 2008) ("The Receiver has standing to bring this suit because, although the losing investors will ultimately benefit from the asset recovery, the Receiver is in fact suing to redress injuries that Wallenbrock suffered when its managers caused Wallenbrock to commit waste and fraud."); *Janvey v. Democratic Senatorial Campaign Committee, Inc.*, 712 F. 3d 185 (5th Cir. 2013); *Wing v. Dockstader*, 482 Fed. Appx. 361, 363 (10th Cir. 2012); *In re Burton Wiand,* 2007 WL 963165, at *2 (M.D.Fla. Mar.27, 2007) ("Because the corporation was injured by the diversion of its assets, the receiver, standing in the shoes of the corporation, had standing to set aside the fraudulent transfers."); *Wing v. Hammons*, 2009 WL 1362389 at *3 (D. Utah May 14, 2009); *Terry v. June*, 432 F. Supp. 2d 635 (W.D. Va. 2006); *Stenger v. World Harvest Church*, 2006 WL 870310, at *6 (N.D. Ga. March 31, 2006) (Court evaluates Plaintiff's fraudulent conveyance claim "with the understanding that Plaintiff brings suit, not as an individual or as a representative of the defrauded investors . . . but rather, "standing in the shoes," so to speak, of those persons and entities in receivership."); *Quilling v. Cristell*, 2006 WL 316981, at *5 (W.D.N.C. Feb. 9, 2006); *Obermaier v. Arnett*, 2002 WL 31654535 at *4 (M.D. Fla. Nov. 20, 2002) ("It is settled that an equity receiver has the power to bring ancillary actions to recover assets which were fraudulently transferred to investors in a Ponzi scheme.")  The Court has been provided with no convincing reason why this should not also be the case here.

**b**

In Count IV of the amended complaint, the Receivers assert that the Defendants were

---

[4]  Defendants argue that the Sixth Circuit parted ways with *Scholes* in *Wuliger v. Manufacturers Life Ins. Co.*, 567 F.3d 787 (6th Cir. 2009), but the Sixth Circuit's discussion of *Scholes* was limited to the applicability of the *in pari delicto* defense, a topic discussed *infra*.

unjustly enriched by receiving the subject transfers from the Receivership Entities, which in turn were funds paid by injured consumers. [R. 12 at ¶¶ 73-78.] Contained within this charge, the Receiver asserts that the subject transfers "constitute ill-gotten gains and the proceeds of illegal and fraudulent activities obtained in violation of applicable law, including without limitation the FTC Act, the FTC rules and regulations and applicable Kentucky consumer protection statutes…" [R. 12 at ¶ 75.]

Defendants attack the Receivership Entities' standing to prosecute this unjust enrichment claim because (1) no private cause-of-action exists within the FTC Act, and (2) the Receivers have provided no basis for asserting standing under the Kentucky Consumer Protection Act. [R. 26-1 at 12.] The Receiver does not assert claims under those statutes, but only cites to those statutes to demonstrate why the gains are ill-gotten. [R. 34 at 21.] As the Receiver needs not have standing to sue under either of those Acts to bring an unjust enrichment claim, these arguments fail.[5]

**3**

*In Pari Delicto* means "equally at fault." Black's Law Dictionary (10th ed. 2014.) This doctrine stands for the proposition that a defendant may be able to escape liability as a result of the "plaintiff's participation in the same wrongdoing as the defendant." *Bubis v. Blanton*, 885 F.2d 317, 321 (6th Cir. 1989) (quoting *Memorex Corp. v. Int'l Business Machines Corp.,* 555 F.2d 1379, 1382 (9th Cir. 1977)).[6] Kentucky Courts have long applied the doctrine, and further

---

[5] Defendants also argue that Counts III and V should be dismissed because they are dependent on the Receiver succeeding on Counts I, II, and IV. [R. 26-1 at 12-13.] Because the Court has elected not to dismiss those claims, it follows that the Defendants' arguments fail as to Counts III and V.

[6] In *Bubis*, the Sixth Circuit distinguished *in pari delicto* from the similar doctrine of *unclean hands*, which "refers to the plaintiff's wrongdoing against a third party with respect to the subject matter of the suit." 885

found that in select circumstances it can apply to corporations just as it might apply to an individual.

> But, where the parties are in pari delicto - and the parties to a fraudulent conveyance, nothing else appearing, are usually so regarded - the maxim guards and bars the portals of the court against both participants. We perceive no essential difference between the status occupied by appellee corporation and that of an individual grantee in a fraudulent deed. The corporate shell is not impenetrable to the eye of the court when it is shown that it was adopted as a shield against the light of truth. In such cases, the existence or absence of corporate formalities will be disregarded and the incorporators subjected to the rules of law governing individuals.

*Pursifull v. Interstate Oil & Gas Corp.,* 293 Ky. 152, 168 (1942).

The parties cannot agree about whether the doctrine applies.  Defendants argue that the Receivership Entities' unclean hands bar the levied claims.  The Receiver argues that the unclean hands doctrine does "not apply to a receiver for a corporation who is seeking to avoid a fraudulent transfer of corporate assets."  [R. 34 at 26.]  As noted by the Receiver, and made abundantly clear by a review of the case law, the seminal case is *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995), *cert. denied sub nom. African Entr. Inc. v. Scholes,* 516 U.S. 1028 (1995). Defendants argue that the Sixth Circuit disavowed *Scholes* in *Wuliger v. Manufacturers Life Ins. Co.*, 567 F.3d 787 (6th Cir. 2009).  It is to this disagreement and these cases that the Court now turns.

In *Scholes*, a man by the name of Douglas was the "mastermind" behind a Ponzi scheme that sold limited partnerships in three shell corporations to investors who operated under the belief that the partnerships traded commodities, and yielded a return based on the sale of those

---

F.2d at 321 (quoting *Memorex Corp.,* 555 F.2d at 1382).

commodities.  56 F.3d 750.  In fact, the majority of the money used to pay investors actually came from the sale of limited-partner interests, instead of commodities.  *Id*.  The Securities and Exchange Commission (SEC) brought a civil suit against Douglas, and a receiver (Scholes) was subsequently appointed to recover what assets he could.  The relevant issue presented was whether Scholes had standing to sue under an Illinois fraudulent conveyance statute (which is very similar to Kentucky's statute).  *Id*. at 753-755.  As here, the Defendants' primary claim in *Scholes* was that the Receiver, occupying Douglas's shoes, lacked standing to recover those fraudulent conveyances due to lack of injury.  Writing for the Court, Chief Judge Richard Posner framed the issue:

> How, the defendants ask rhetorically, could the allegedly fraudulent conveyances have hurt Douglas, who engineered them, or the corporations that he had created, that he totally controlled and probably (the record is unclear) owned all the common stock of, and that were merely the instruments through which he operated the Ponzi scheme?

*Id.* at 754.  The Court answered its own question.  While normally "the maker of [the] fraudulent conveyance and all those in privity with him—which certainly includes the corporations—are bound by it," the justification for this rule disappears where the wrongdoer has been replaced by a Receiver.  *Id.* (citations omitted).  As Posner explained:

> [T]he reason [for this rule]. . . is that the wrongdoer must not be allowed to profit from his wrong by recovering property that he had parted with in order to thwart his creditors. That reason falls out now that Douglas has been ousted from control of and beneficial interest in the corporations. The appointment of the receiver removed the wrongdoer from the scene. The corporations were no more Douglas's evil zombies. Freed from his spell they became entitled to the return of the moneys—for the benefit not of Douglas but of innocent investors—that Douglas had made the corporations divert to unauthorized purposes. *McCandless v. Furlaud, supra,* 296 U.S. at 159–61, 56 S.Ct. at 47; *Texas & Pacific Ry. v. Pottorff,* 291 U.S. 245, 260–61, 54 S.Ct. 416, 420, 78 L.Ed. 777 (1934); *Southmark Corp. v. Cagan,* 999 F.2d 216, 222 (7th Cir.1993). That the return would benefit the limited partners is just to say that anything that helps a corporation helps those who have

> claims against its assets. The important thing is that the limited partners were not complicit in Douglas's fraud; they were its victims.
>
> Put differently, the defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated. *McCandless v. Furlaud, supra,* 296 U.S. at 160, 56 S.Ct. at 47; *Albers v. Continental Illinois Bank & Trust Co.,* 296 Ill.App. 596, 17 N.E.2d 67 (1938).

*Id.* at 754-755.  Accordingly, pursuant to *Scholes,* a receiver may recover fraudulent conveyances made by the bad actors whose shoes he fills because the traditional defense that the maker of a fraudulent conveyance is bound by it loses its justification after the bad actor is replaced.

Defendants argue that *Scholes* was rejected by the Sixth Circuit in *Wuliger*, 567 F.3d 787 (6th Cir. 2009).  In *Wuliger* an investment company (Liberte Capital Group) "purchased life insurance policies from 'viators'—policyholders who are terminally ill or who are elderly and in poor health—in exchange for paying the viators an up-front lump sum." *Id.* at 790.  Liberte then sold investments in its operations to investors who were recruited by independent brokers, and used the investors' payments to pay the premiums on the procured insurance policies.  *Id.* Eventually, the SEC discovered the fraudulent scheme and a receiver was appointed to manage Liberte.  *Id.*  Relevant here, the receiver asserted fraudulent conveyance claims against the insurance company, demanding a return of the premiums paid by Liberte.  *Id.*  The district court found the unclean hands defense inapplicable because Liberte's chief executive had been removed, freeing Liberte of all wrongdoing.  *Id.* at 798.  The Sixth Circuit reversed, finding that the district court had incorrectly applied *Scholes.  Id.* at 798.  The Court distinguished the cases from one another:

> Unlike in *Scholes,* where the corporation's culpability could be foisted onto one individual who appeared to have single-handedly created these shell corporations

18

> and the ensuing Ponzi scheme, there is no evidence in the record that Liberte's fraud can be attributed in its entirety to Jamieson.

*Id*. at 798.  Without specific evidence in the record of Liberte's chief executive's role in the scheme, the Court declined to conclude that removing the chief executive "wiped Liberte's slate clean."  *Id*. at 798.  The Court, instead, found that "as Liberte's successor-in-interest, the Receiver [was] precluded by Liberte's unclean hands from bringing the rescission claims."  *Id*. at 799.

The question for the Court is whether the facts of this case make it more like *Scholes* or *Wuliger*.  In support of its argument that the case is more like *Wuliger,* Defendants note that the Receiver fails to identify any single individual responsible for its alleged fraudulent activity in its amended complaint.  Instead, Defendants point out that the Receiver blames the fraudulent activity on the "Receivership Defendants."  [R. 12 at ¶ 27 ("the Receivership Defendants engaged in a common enterprise by which they conducted an unlawful multilevel marketing "pyramid" scheme").]

The Court notes two occasions where wrongdoers were referenced, albeit somewhat indirectly.  First, in the amended complaint, the Receiver notes that the "eight owners and shareholders of the Receivership Defendants received dividends and payments from the Receivership Defendants…"  [R. 12 at ¶ 41.]  While there is no elaboration on the identities of these persons, this reference highlights an important fact—real people were at the corporate entities' helm.  Those persons were pulling the strings and the corporations, like marionettes, responded.  Second, as noted *supra,* the amended complaint incorporated both the preliminary and permanent injunctions by reference.  [*See* R. 12 at ¶ 6-7; R. 12-2 (Stipulated Preliminary Injunction); R. 12-3 (Permanent Injunction).]  The Permanent Injunction specifically

19

distinguished between "Corporate Defendants" (described herein as "Receivership Defendants" or "Receivership Entities") and "Individual Defendants" Paul C. Orberson, and Thomas Mills. [R. 12-3 at 6.]  That permanent injunction appointed the Receiver to stand in the shoes of the "Corporate Defendants," but not for the "Individual Defendants."  [R. 12-3 at 18.]  The Individual Defendants were removed so, to quote *Scholes*, "[t]he corporations were no more [the individual Defendant's] evil zombies."  56 F.3d at 754.

The Receiver provides the Court with a few more reasons to distinguish (or disregard) *Wuliger*.  First, the *Wuliger* Court did not consider *Scholes* in the context of a fraudulent conveyance claim.  Instead, the *Wuliger* Court was evaluating a rescission claim.  Second, the Sixth Circuit in *Wuliger* was considering the district court's decision granting a motion for summary judgment, not a motion to dismiss.  Third, the claim was analyzed under Ohio law.  Fourth, the the Court's discussion of *Scholes* was not necessary to the resolution of the claims in that case.  The Sixth Circuit had already concluded that "Ohio's courts [had] already spoken with [ ] clarity on the issue," rendering the Court's discussion of the unclean hands dicta.  Finally, Receivers also point out that the Defendants do not cite to a single case where a fraudulent transfer suit filed by a federal equity receiver over a corporate receivership entity was either barred or dismissed because of the doctrine of *in pari delicto*.  [R. 34 at 22.]  This point is well-taken.

Public policy also supports permitting this case to survive beyond this stage of the litigation.  As the Court in *Pursifull* put it, the *in pari delicto* defense "is a creation of the courts to purify the stream of justice, and is never employed to pollute it." 293 Ky. 152 at 168 (1942). To apply the doctrine in this case would not punish the persons who were truly the alleged

20

wrongdoers who were in charge of the Corporate Defendants, but would have the incidental effect of harming the poorly compensated investors in their scheme.

**III**

      Accordingly, for the aforementioned reasons, it is hereby **ORDERED** that the Defendants' Motion to Dismiss [R. 26] is **DENIED.**

      This 30th day of September, 2015.

Signed By:

*Gregory F. Van Tatenhove*

**United States District Judge**